40908. ADRIAN HOUSING CORPORATION v. COLLINS et al.

(319 SE2d 852)

HILL, Chief Justice.

The appeal in this case is from a trial court order granting summary judgment to Marcus E. Collins, Sr., Revenue Commissioner, and against Adrian Housing Corporation, finding Adrian liable for sales taxes on the full sales price of its prefabricated modular homes. Adrian appeals.[1]

Adrian was incorporated in 1962 and began fabricating modular homes and relocatable classrooms, a business in which it continues today. Since the tax involved here is primarily on the sales of modular homes, we will discuss Adrian's operation as it relates to the homes.[2] When a "sales contract" for a prefabricated home is received, a "breakdown sheet" is prepared which indicates the style and size of the home chosen, and the options the buyer has selected as well as the purchase price. The home is then constructed, in two units, on an assembly line in the company's plant. Each separate unit is 12 feet wide, but varies in length from 30 to 54 feet according to the floor plan chosen by the purchaser.

After the floor joists are constructed and the linoleum applied, the walls and gables are added at "stops" in the framing section of the plant. Then, when the modules move to the finishing section, plumbing, wiring, heating, doors, windows, interior trim, roofing, insu-

---

[1] The statement of the facts is taken from undisputed facts and from written documents; conclusory affidavits and depositions have been disregarded.

[2] The construction and sales of classrooms were done in essentially the same manner as the homes. We note that in a 1970 tax case between Adrian and the Commissioner, Adrian successfully argued in the superior court that its classrooms were "tangible personal property" under the Sales and Use Tax Act, but that the sales were exempt because they were made to local governments. See OCGA § 48-8-3 (1). The Commissioner did not appeal.

lation and outer wall coverings are added. After the surfaces are painted, the modules are loaded onto flatbed trailers. Tractors haul the loaded flatbed trailers to the purchaser's site. There, depending on the contract with the purchaser, the foundation has already been prepared by the purchaser, a contractor, or by subcontractors hired by Adrian, and the modules are set upon it and bolted together, the wiring is connected and the trim is finished.

In January 1979, a new corporation, Gillis Home Sales, Inc., was formed by several of the principals of Adrian with two purposes in mind: (1) as a means to disperse more money from the business and (2) to transfer the delivery operation from Adrian in order to reduce its exposure to liability. Adrian then sold Gillis the salesmen's cars and the 5 tractors and the approximately 32 flatbed trailers it owned. Gillis then operated out of Adrian's offices as a separate legal entity.

According to the only agreement of record between the two companies, Gillis became the exclusive "sales representative" for Adrian, and is denominated an independent contractor. Adrian agreed that it would forward to Gillis all sales inquiries received and would not negotiate directly with any purchaser. The agreement provided that "Representative [Gillis] *shall conduct its business in its own name,* maintain a sales office and pay its own expenses for the sale and promotion of Company's [Adrian's] products." (Emphasis supplied.) Gillis agreed that it would be solely responsible to Adrian for payment of all merchandise delivered to Gillis. As consideration, Gillis agreed to a 5% "commission."

Gillis' salesmen continued to make sales as before by sales contracts, where a downpayment was made with the balance due on completion, or, more often when a contractor was the customer, by agreements where a security deed was taken in the owner's lot by Gillis.[3] In either case, a "house check list" indicating the cost of each option or service provided by Adrian, and a "breakdown sheet" or work order was completed for each sale. Prices were individually set for each contract by Carl Gillis, president of both companies. Contracts were also approved by an Adrian vice president for engineering soundness in light of any modifications by the customer and any problems involved in moving the house onto the foundation at the owner's lot. However, in all of the transactions included in the Revenue Commissioner's assessment, the "seller" named in the customer's "sales contract" is Gillis.[4]

---

[3] Some homes were also sold through the Farmer's Home Administration and payments were guaranteed by it. (In addition, classrooms were sold by letter agreement with local governments.)

[4] Adrian's argument that in representing itself to be the "seller" in the sales contracts, Gillis was acting as agent for an undisclosed principal (Adrian), is refuted by the declaration

When a sale to a customer was closed by Gillis, simultaneous entries were made in Gillis' and Adrian's books by one bookkeeper who is an officer of both corporations. After the sale price was remitted to Gillis by the customer, the check was deposited in Gillis' checking account and entered as a sale on its books. A Gillis check payable to Adrian was then drawn on Gillis' account for the sales price less Gillis' 5% "commission." This latter amount was then entered on Adrian's books as its sales price. Thus the 5% "commission" (markup) never appears on Adrian's books.

It is also clear that the salesmen and delivery crew were carried on Gillis' accounts as Gillis' employees, and were paid by payroll checks drawn on Gillis' account. Reports to that effect were filed with the Georgia Employment Security Agency and the Internal Revenue Service for unemployment and Social Security purposes respectively. However, the bookkeeper testified that Adrian reimbursed Gillis for these salaries and expenses and these costs were included by Adrian in calculating the actual cost of each modular home it produced. Thus, Gillis did not deduct these costs on its income tax reports, while Adrian did. Nevertheless, these employees were paid by Gillis and were employees of Gillis, notwithstanding Adrian's lump sum reimbursements to Gillis.

During the entire period of its existence, Adrian had always paid use taxes on the "weighted" cost of the materials used in constructing each modular home. The tax was remitted in the month the home was sold and the money received for its sale. Gillis never paid any sales or use taxes.

The Commissioner, in auditing sales by Adrian from January 1979, until May 1981, determined that the modular homes sold during this period were "sales of tangible personal property" by Adrian to Gillis, which then resold the property to its customers.[5] As a sale of tangible personal property, the Commissioner contends a sales tax is due on the sales price of the homes from Adrian to Gillis rather than a use tax on the cost of materials used in their construction, which is what Adrian had been paying. Therefore, the Commissioner assessed Adrian for additional taxes, penalty and interest in the amount of $282,723.37, the difference in the use tax already paid and the sales tax he contends is due.

Adrian urges that it is in the business of constructing homes just as any other residential contractor and should not be taxed differently because it uses modern, cost-effective construction techniques.

in the agreement between Adrian and Gillis that Gillis is an independent contractor and is solely responsible for payment to Adrian.

[5] When the Commissioner's audit results were made known to Adrian, Gillis was immediately dissolved.

Adrian defends further on the ground that nothing changed in the way its business was conducted after Gillis was formed and that Gillis was merely a sales representative for Adrian, paid a commission to sell its products. The homes were delivered and fixed to the property by Adrian, who retained the risk of loss.[6] It is to be remembered, however, that the delivery trucks were owned by Gillis and the delivery and installation crews were employees of Gillis.

We turn now to our sales and use tax law. The issue is whether or not the transaction between Adrian and Gillis is a sale of tangible personal property under our law. OCGA § 48-8-30.

Under OCGA § 48-8-2 (11), " 'Tangible personal property' means personal property which may be seen, weighed, measured, felt, or touched or is in any other manner perceptible to the senses. 'Tangible personal property' does not mean stocks, bonds, notes, insurance, or other obligations or securities."[7] OCGA § 48-8-2 (8) provides that " 'Sale' means *any transfer of title or possession, transfer of title and possession*, exchange, barter, lease, or rental, conditional or otherwise, in any manner or by any means of any kind of tangible personal property *for a consideration. . . .*" (Emphasis supplied.)

We hold that the transaction between Adrian and Gillis is a sale of tangible personal property for which Adrian is liable for sales tax based on the sales price of the property sold to Gillis as contended by the Commissioner. Although Adrian claims that Gillis is only its sales representative, Gillis is denominated as the seller in the sales contracts with purchasers, not an agent. Therefore, it is clear that there must be a sale from Adrian to Gillis so that Gillis can pass title to the purchaser. A sale is defined in the sales tax act as a "transfer of title or possession, transfer of title and possession . . . for a consideration." OCGA § 48-8-2 (8), supra. There is a transfer of possession when Gillis' delivery crews accept the modular homes at the Adrian plant and a transfer of title so that Gillis can pass title to its purchasers under their sales agreements.

Adrian argues strenuously that the modular homes cannot be tangible personal property because they are fixed to realty. We agree that when the modules are delivered and fixed to the foundation on the customer's lot they may become realty. The focus here, however, is at the time the modules are transferred from Adrian to Gillis. At that time, the modules are half units on Gillis' flatbed trailers waiting

---

[6] The risk of loss was not covered in any of the agreements in the record, but employees of Adrian testified that if something happened to the homes in transit or while being placed on the foundation, they were repaired on the site or back at the plant by Adrian.

[7] In *Thyer Mfg. Corp. v. Drake*, 217 Ga. 114 (121 SE2d 136) (1961), the court assumed, without deciding, that prefabricated houses were "tangible personal property" subject to our sales tax. As anyone who attempts to pass one on the highway knows, modular homes can be seen, weighed, measured, etc.

to be moved to a purchaser's lot by Gillis, and are properly considered tangible personal property. The argument that Adrian carries the risk of loss and reimburses Gillis for the delivery crew's expenses does not change this result. That the transaction involves the transfer of title or possession, or the transfer of title and possession, of tangible personal property for consideration must control. It follows, therefore, that the trial court did not err in granting summary judgment to the Commissioner and denying summary judgment to Adrian.

*Judgment affirmed. All the Justices concur, except Clarke and Smith, JJ., who dissent.*

DECIDED SEPTEMBER 6, 1984.

*Hurt, Richardson, Garner, Todd & Cadenhead, William L. Harper, Tory L. Shanholtzer, Jane C. Barwick,* for appellant.

*Michael J. Bowers, Attorney General, David A. Runnion, Assistant Attorney General,* for appellee.